IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 23, 2007

## STATE OF TENNESSEE v. CAROLYN J. NOBLES

**Direct Appeal from the Circuit Court for Bedford County**
**No. 15864    Lee Russell, Judge**

**No. M2006-00695-CCA-R3-CD** - Filed March 7, 2007

The Defendant, Carolyn J. Nobles, pled guilty to three counts of check forgeries, and a jury found her guilty of sixty-eight check forgeries.  The trial court sentenced the Defendant, a Range I offender, to an effective sentence of seventeen years and six months.  On appeal, the Defendant contends that the evidence is insufficient to sustain her convictions and that the trial court erred when sentencing her by denying her alternative sentencing and by ordering that some of her sentences run consecutively. Concluding there exists no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS H. WOODALL, JJ., joined.

Andrew Jackson Dearing, III, Shelbyville, Tennessee, for the appellant, Carolyn J. Nobles.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Mike McCown, District Attorney General; Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I.  Facts
### A.  Facts at Trial

In this case, the Defendant was indicted by the Bedford County Grand Jury for 150 counts of check forgery.  The Defendant pled guilty to three counts of check forgeries,[1] and a jury found her guilty of an additional sixty-eight counts.  Of the seventy-one convictions, sixty-five were class E felony convictions and 6 were class D felony convictions.

At the Defendant's trial, the following evidence was presented: Susie Cartwright Johnson

---

[1]We note that no transcript of the guilty plea hearing is included in the record.

testified that her parents are Bobby and Jane Cartwright, both of whom had significant health problems. Bobby Cartwright had diabetes, and Jane Cartwright suffered two strokes that, while not affecting her mental ability, impaired her ability to walk and talk. Johnson hired the Defendant to care for her mother approximately two years ago. The arrangement included that the Defendant came to the Cartwrights' home on Tuesday and Thursday mornings after Johnson had given her mother a bath. The Defendant would fix breakfast, do light housework, and stay, doing whatever was needed, until 2:00 or 2:30 p.m. when the other sitter arrived. On Saturday and Sunday mornings, the Defendant gave Mrs. Cartwright a bath, fixed her breakfast, and stayed most of the day. She would cook Mrs. Cartwright's supper and then put her to bed around 8:00 p.m. She received a check from the Cartwrights in the amount of $380 per week for her services.

Johnson testified that the Defendant's duties also sometimes included opening the mail and paying bills. The Defendant would fill out the checks and then Mrs. Cartwright would sign the checks. The Defendant did not have authority to write other checks or to sign Mrs. Cartwright's name to any checks. Johnson said that her parents had three checking accounts: a personal account; an account for a trucking company that they owned; and a farm account, which was her mother's "personal little checking account." The checkbook for the trucking checking account was located in a desk by the back door, and the checkbook for the two personal accounts were kept in a basket in the living area where Mrs. Cartwright stayed.

In June of 2005, Cindy Vanada, an employee of First Community Bank, called Johnson about a check that the Defendant had written on the Cartwrights' account. Johnson went to the bank and examined the check, which was written to First Community Bank in the amount of $1,766.36. Johnson thought that there was something amiss. She took a copy of the check to Mrs. Cartwright, and the two discussed the check. As a result of this conversation, Johnson called the Defendant and asked the Defendant to come to the Cartwrights' home. When the Defendant arrived, Johnson questioned her about the check, which bore the Defendant's signature, and the Defendant admitted that she had cashed the check and said she would get another job to pay the money back. The Defendant told Johnson that Johnson could not send the Defendant to jail because the Defendant had to care for the Cartwrights.

Johnson said that she then examined her parents' accounts to see if there were any similar transactions. She went to her parents' bank and asked that they pull every check that was written to the Defendant or to anything she described as a "red flag" similar to the check to First Community Bank, a bank with which her family avoids doing business. Johnson received copies of all the checks that were written to First Community Bank and to the Defendant starting January 1, 2005, and she gave those to the police department to aid in the investigation.

Johnson said that she sorted through the checks that she received from the bank and separated out the Defendant's weekly paychecks from the other checks that were improperly written. Johnson identified 75 checks that showed a signature other than her mother's on the signature line. Johnson said that the signature was "too neat" to be her mother's signature because Mrs. Cartwright had had a problem writing since her stroke. Additionally, she noticed that the "t" in Cartwright on these

checks was different from the way her mother signed her name.

On cross-examination, Johnson testified that she did not have time to reconcile her parents' checking accounts. Johnson agreed that there were times when the Defendant worked "some extra" but said that it worked itself out at the end of the week. Johnson was unaware of any pay raise given to the Defendant, and she said that the Defendant lived rent free in one of her parents' rental houses. The Defendant told Johnson that she had worked on the house, and she would charge her father's account at Shelbyville Lumber for the cost of supplies to do normal repairs. Johnson said that she recalled a time when the Defendant cut her finger while she was working at her parents home. On redirect examination, Johnson testified that the Defendant was not supposed to receive more than one $380 check per week or any additional checks beyond the one payroll check. Further, the Defendant usually worked forty hours per week and never worked 80 hours a week.

Jane Cartwright testified that the Defendant was her care giver for a couple of years and was paid the equivalent of $10 per hour. Mrs. Cartwright said that the Defendant was paid on Thursday or Friday and that the Defendant would write herself a check from the Cartwrights' personal account that Mrs. Cartwright would sign. Neither Mrs. Cartwright nor her husband ever gave the Defendant permission to write any other checks, and the Defendant's paycheck was never to be written from the trucking or farm checking accounts. Further, the Defendant was never given permission to pay her personal loans using the Cartwrights' checking accounts.

Mrs. Cartwright recalled that, in June of 2005, Johnson showed her a check from First Community Bank that Mrs. Cartwright had not written. When the Defendant came to her house and Johnson questioned her about the check, the Defendant agreed that she had written the check and said that she would pay the money back. A short time later, the Defendant sent her a letter that said:

> Dear Granny Jane: I'm so sorry for what I did, mainly because you were my friend and I took advantage of that. I know I was wrong and I took some checks, but please, please don't let [Johnson] take my whole life. I'm willing to pay the money back, but you're the only one who can talk to her. I'm so sorry.

The letter was signed by the Defendant, and there was a post script that stated, "P.S. Joe is coming on the Fourth of July weekend to move my things out of the house."

Mrs. Cartwright was shown the stack of checks that were alleged to have been forged. She said that she did not know whether she wrote any of these checks. She said that her handwriting had never been as nice as the handwriting on some of the checks. Further, she agreed that the "t" in Cartwright was written differently than the way that she writes it when she signs her name. Mrs. Cartwright said that the Defendant was supposed to make $380 per week. While Mrs. Cartwright did not know whether the Defendant was ever supposed to make any more than that, she said that the Defendant was not supposed to make as much as twice or four times that amount per week.

On cross-examination, Mrs. Cartwright agreed that the Defendant worked for her for a little

over two years and that she lived in one of her rental houses. She recalled that the Defendant did some maintenance work to the rental house, including putting in some carpet. Mrs. Cartwright did not agree to pay the Defendant for the carpet because the carpet was taken from another place owned by the Cartwrights. Mrs. Cartwright agreed that she would call the Defendant when she needed her and that the Defendant took good care of her. She remembered when the Defendant cut her finger, and she told the Defendant she would pay for the doctor's bills. Mrs. Cartwright said that she never paid the bill because the Defendant never brought her one. Mrs. Cartwright agreed that if the Defendant worked 40 hours per week, she should would make $400, and if she worked fifty hours per week she would make $500.

Jason Williams, a Sergeant with the Shelbyville Police Department, testified that he was assigned to investigate allegations of forgery against the Defendant after Johnson filed a report on June 14, 2005. Sergeant Williams said that he conducted a videotaped interview with the Defendant. That videotape was played for the jury. During that interview, the Defendant said that she was aware that she improperly wrote four checks but said that she did not write the rest of the checks. The sergeant then informed her that he had obtained the videotape footage from the bank and that there were quite a few more than four checks. The Defendant said that she cashes all of her checks at First Community Bank because that is where she does her banking. She asked how the sergeant would determine which checks were properly written to her and which ones were not, and the sergeant informed her that the checks written since the end of January totaled about $44,900. The Defendant said that Mrs. Cartwright sometimes paid her twice and paid her extra if she worked extra days. The Defendant agreed that the extra money did not account for the almost $45,000 in checks.

During the interview, the Defendant said that one reason that she wrote the checks was because she had cut her arm, and Mrs. Cartwright offered to pay for the hospital bills but never did so. She said that her bills totaled about $10,000. The Defendant said that some of the other checks she passed were for "spending money." She said she thought that "because [the Cartwrights] lived high on the hog [she] thought [she] should too." The Defendant said that most of the money was used to fix up her house or to pay for hospital and doctor bills. Her doctor bills included bills for three hernia surgeries. The Defendant expressed concern that some of the checks that she was alleged to have forged were legitimate checks written by Mrs. Cartwright. She also was concerned about the influence of the Cartwrights on prominent members of the community. After the tape of the interview was played for the jury, Sergeant Williams testified that, as a result of the information that he gathered, he charged the Defendant with various forgeries.

On cross-examination, Sergeant Williams testified that there was no indication from his investigation that the Defendant had a drug or gambling problem. Further, he said that the Defendant consistently said that she forged four checks. The sergeant said that he was present that morning in court when the Defendant pled guilty to forging three checks. On redirect examination, the sergeant testified that when he told the Defendant that there could be as many as 90 forged checks she never said that it could not be that many. Further, when he told her that the amount totaled $45,000, or $9,000 per month, she never said that she had only forged four checks.

4

The Defendant testified that she began working for the Cartwrights about two and a half years before the trial, and, while she worked for them, she moved into one of their homes that she described as in "[p]retty bad" condition. She thought that the home was salvageable, she worked on the home while she lived there, and Mrs. Cartwright would pay her for the work that she did and reimburse her for materials.

The Defendant admitted that she forged four checks. She explained that she did not forge the other checks. While working for Mrs. Cartwright, she would sometimes write a check for her and Mrs. Cartwright would sign the check. She said that Mrs. Cartwright did not always put the date on the check, and the Defendant sometimes held the check for a while before taking it to the bank. When this happened, the bank would fill in on the check the date that she cashed the check. The Defendant explained that one of the checks that she was alleged to have forged was written to her legitimately as a loan for a dryer and another was written to her to pay her doctor's bills for an injury that she received while she was employed with the Cartwrights. Further, the Defendant said that she had written Mrs. Cartwright a letter offering to pay her back for the four checks that she had forged.

On cross-examination, the Defendant said that she moved into the rental house during the "last part" of 2004. She said that she put in a new kitchen floor, and the tiles cost $120.00. The Defendant would tell Mrs. Cartwright how much the materials were, and Mrs. Cartwright would reimburse her that amount. The prosecutor reminded the Defendant that the smallest check amount in the checks for which she was on trial was $280.00. He then asked if that meant that the tile reimbursement check was not included. The Defendant explained that she did not get reimbursed one bill at a time. She could not identify which check included the amount for the tile. She again said that she would add the bills together before Mrs. Cartwright reimbursed her. The prosecutor noted that all of the checks were for an even amount.

The Defendant said that the check in the amount of $1,082.08 was for her doctor's bills. She testified that the check was written to First Community Bank because that is the bank where she had her checking account. Mrs. Cartwright asked her if she would like the check written to her or her bank, and the Defendant said the bank but offered no reason why she preferred the checks be written to the bank. The Defendant testified that she used the check for $1082.08 to pay two separate doctors' bills. The Defendant testified that her bills were from when she cut her wrist while preparing a meal for Mrs. Cartwright in August of 2004. She agreed that it was not until six months after her injury that Mrs. Cartwright gave her the money for her bill. The Defendant acknowledged that she told Deputy Enoch that the hospital bills totaled $10,000, and she maintained that the checks were for her bills.

The Defendant also explained that, twice, she had worked a double shift for another caretaker who was sick with pneumonia. She got paid $680 per week for those two weeks. The Defendant agreed that she made $1,520 in an average month, and she agreed that the checks written to her since January totaled approximately $9,000 per month, but she maintained that she had "worked for" this money by working on the house and performing extra jobs.

5

The Defendant agreed that, on the check that she forged, she intentionally misspelled her name. She conceded that Mrs. Cartwright sometimes misspelled her name, so she misspelled her own name when forging the check to make it look bona fide. She denied signing Mrs. Cartwright's name to any of the other checks.

Based upon this evidence, the jury found the Defendant guilty of sixty-eight check forgeries, in addition to the three check forgeries to which the Defendant pled guilty.

## B. Sentencing Hearing

At the sentencing hearing, the following evidence was presented: The Defendant testified that before she was incarcerated she was a caretaker for Mrs. Cartwright. The Defendant completed the tenth grade in school. She admitted she was guilty of writing the three checks but said she was not guilty of forging the other checks. The Defendant asked for mercy and said that she had written a letter of apology to both Cartwright and Johnson. She also asked the court to consider that her family was older and in poor health and that she was the only one who could care for them. The Defendant told the court that this would be the first time that she was in jail and that she had already been there almost eight months. The Defendant said that, in jail, she had gotten back "on track with the Lord" and learned that it is hard to be away from her family. She said she would like to go home.

On cross-examination, the Defendant conceded that she had a previous conviction in 1998 that stemmed from a bad fifty dollar check that she had written on her account. The Defendant denied knowing a person named "Pam Sehorian." After being confronted with further documentation, the Defendant agreed that the check had been for $150 and that it was written on Pam Sehorian's account and not her own account. She then said she had previously "misunderstood."

The court found:

Alright, we begin with the question of her range. . . . I think everyone is in agreement that she's Range I. The D felonies, on the D felony she's two to four [year range]. And on the E felony she's one to two [year range]. And we begin with the presumption in favor of the minimum on both of those. And we look at enhancing factors.

I find that . . . [enhancement factor] Number 1 is present, that she does have a prior history, albeit not an extensive prior history. She has a prior history of a theft conviction. And I do make the fact find that the, that it was theft and not [passing a worthless check conviction]. And I would refer everyone to the exhibit that's now been put in.

I find present Enhancing Factor Number 4, the vulnerability of the victim. That victim was not only vulnerable because of her age, but because of the serious

health problems that had le[d] this defendant to be hired by the family.

I find that Factor Number 6 is present, the amount of the loss is great, far beyond what is necessary to establish the convictions that total in excess of 40 thousand dollars.

I find that Number 14 is certainly present. She abused a position of private trust, to say the least. She was hired to take care of this lady and she used the lady's checkbook to enrich herself. So on the D felonies I enhance her from two years up to three and a half years. And on the E felonies, from a year to a year and a half on each of those.

As far as the mitigating factors, only one has been suggested. That is that this crime did not cause or threaten serious b[odily] harm. That is the case. however, I do not give great weight to that. And therefore I do not reduce the sentence by any amount as a result of that.

The next question is consecutive or concurrent. I make a finding that none of the factors are present. The exception is under 40-35-115, unless the – Number 2, the extensive criminal record is applicable. I find expressly that the one prior theft conviction would not be sufficient to put her into that category.

So the question for me is as a matter of law whether or not I can consider earlier activity. This multi-month time period that we're dealing with, can I consider on sentencing her on the later checks, can I consider the fact that she was doing this earlier or is that not allowable as [the Defendant's counsel] said.

And Number 1, because first and foremost because this was one scheme. That seems to be the defense's position. And I understand that position. I just don't know what the case law says on it.

So I'm going to ask counsel to brief that issue . . . .

As far as alternative sentencing, let me say this. One of the factors in 40-35-103(5) is potential or lack of potential for rehabilitation, including risk of committing another crime while on probation. I find that that risk is very, very high in her case for several reasons. The evidence at the trial was simply overwhelming, and yet in the face of that she persists in not only acting as though she didn't do these things, but somehow shifting the fault to Ms. Johnson and shifting the fault to Ms. Cartwright, both at trial and here.

And she absolutely got on the stand today and perjured herself about this prior theft conviction in the face of the fact that the pre-sentence officer had turned up the theft and had accurately reported it. And she still today tried to pull the wool over

7

my eyes by claiming this is a [passing a worthless check conviction].

I'm sorry, I do not believe she is at all remorseful for what she has done, not at all remorseful. And so I think she's a bad risk. So the question is a legal one, and that is whether or not I can consider in determining whether she gets consecutive or concurrent sentencing, as to whether I can consider this period of criminal activity that was the subject of this trial and her conviction.

After the parties briefed the issue regarding consecutive or concurrent sentencing, the trial court found at a subsequent sentencing hearing:

What we have not [yet] done, because a legal issue came up, is . . . consecutive or concurrent sentencing. The reason we did that is because everyone knows, there is a presumption in favor of concurrent sentencing, under 40-35-115(d) . . . . Unless one of seven factors contained in 40-35-115(b) . . . is present.

Our question then is whether the second factor is present here, which is an extensive criminal record. What came up is the fact that these checks that were forged in this particular case were forged over a period of four months and a week, from February the 1st 2005 until June the 9th 2005.

So the question that came up is whether, in considering whether there is an extensive past criminal record when we're looking at the later forgeries, is it appropriate to look at the earlier forgeries that are presently before me for sentencing in determining whether or not the sentencing will be concurrent or consecutive.

. . . .

I think we are all now in agreement that . . . the presumption created in favor of concurrent sentencing may be overcome by a finding of an extensive criminal record by relying in part at least on earlier activity, which includes the very same convictions for which the sentence is being imposed at this point, at least if the period of activity is long enough.

. . . .

So our total convictions are 71. Sixty-eight checks by the jury, three by pleas, for a total of 71.

. . . .

Again the checks were written between February the 1st 2005 and June the 9th 2005, which is a period of approximately four months and a week. All of these 71

8

checks, except six, were E felonies, because they were all under the thousand dollar mark. And then six of them were above a thousand dollars. . . . [A]nd those are of course D felonies. So we have six D felonies.

. . . .

And in February she wrote 14 checks, forged 14 checks. In March she forged 21 checks. It is my conclusion about these first 35 checks that they should be served concurrently or at the same time as each other, because the only thing previous to these is her one theft conviction.

So I do not find that the presumption in favor of concurrent sentencing is overcome as to the first 35. So the effective sentence for February and March is three and a half years.

Now when you get to April you will find that she has a total of 14 forgeries. . . . I find that the presumption in favor of concurrent sentencing is overcome to this extent. I will make those 14 checks, the sentences, concurrent with one another, but I will make them consecutive to the 35 checks for February and March. So . . . those 14 include one of the D felonies. And therefore we have three and a half plus three and a half so far.

In looking at May we have 17 checks, total, in May, for the period of May 1st through May 15th. So for the first half of May she has a total of nine checks. And for the second half of May, which would begin May the 16th through May the 31st she has another eight checks. So that divides them almost exactly in half for the month of May.

[F]or the first half of May, I will allow them to be served concurrently with one another. But they will be consecutive to the sentences in the February and March time period and in the April time period.

Again, in that first half of May we have one of the D felonies. And therefore, that would add another three and a half years to the sentence.

The second half of May had eight checks. I will allow them to be served concurrently with one another, the last half of May checks served concurrently with one another but consecutive to the batch of checks in February and March, the batch of checks in April, and the batch of checks in the first half of May. So we add another three and a half years to the effective sentence.

Now in each of these I'm finding that the . . . presumption in favor of concurrent is overcome by the combination of the prior theft conviction plus the prior

activity, the prior forgeries in February and March, April and so forth. In other words, the earlier . . . forgeries on these later checks I'm taking into account in finding that the presumption has been overcome.

Finally in June there are five checks written. And again, one of them is one of the D felony checks. And so I'm allowing those June checks, those sentences to be served concurrently with one another but consecutive to her sentences from February, March, April, the first half of May, and the second half of May. So that adds another three and a half years to that sentence.

And again, the presumption in favor of concurrent sentencing is overcome by the theft conviction and by the February, March, April, first half of May and second half of May forgeries.

So the total effective sentence will be 17 years and six months.

I do not find that she is a good candidate at all for alternative sentencing. Again, there is a presumption in favor of alternative sentencing but it is overcome in this case by several factors. And if you look at 40-35-103(d), one question is the issue of potential or lack of potential for rehabilitation.

In this case I find the likelihood of rehabilitation without extensive incarceration to be very low. If you look at the fact that even at the first half of her sentencing hearing she did not testify truthfully. I find that she did not testify truthfully at her trial, in a very dramatic way. She has made some statements pre-trial that certainly cause me a great deal of concern about her attitude and the likelihood that she would repeat.

Her language was that she saw the Cartwright's living "high on the hog" and she thought she should be able to do so also. And I do not think she is a good candidate for alternative sentencing at all.

I am required by case law to look and determine whether or not the overall sentence is consistent with the sentencing reform act and the concerns expressed there. I think that the sentence is reasonable in light of the extent of what she did and her past record. I don't think that this is an oppressive sentence, given the fact that she took around 45 thousand dollars from someone whose mental condition and age rendered her rather helpless as a victim of this particular crime.

And . . . I'm mindful that she has to be given a sentence like any other defendant, a sentence that's just bad enough to address the problem. And I think that's what's been done in this particular case. So that will be my sentence.

10

The Defendant appeals her convictions and sentence.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain her convictions and that the trial court erred when sentencing her by denying her alternative sentencing and by ordering that some of her sentences run consecutively.

## A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain her convictions because the convictions are based on circumstantial evidence and do not prove beyond a reasonable doubt that the Defendant wrote the forged checks. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). If the State's evidence is based upon wholly circumstantial evidence, that evidence must be both consistent with guilt and inconsistent with innocence. Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775. Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. See State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

According to Tennessee Code Annotated section 39-14-114(a)(2003), "[a] person commits an offense who forges a writing with intent to defraud or harm another." "'Forge' means to: [a]lter, make, complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act," or "[i]ssue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged . . . ." Tenn. Code Ann. § 39-14-114(a)(1)(A), (C) (2006).

11

In this case, viewing both the direct and circumstantial evidence in the light most favorable to the State it establishes that the Defendant had access to Mrs. Cartwright's checkbooks and legitimately wrote some checks for her to sign. The Defendant used that access to the checkbooks and wrote checks to herself and to First Community Bank that she cashed. Mrs. Johnson testified that none of the checks entered into evidence bearing Mrs. Cartwright's purported signature were written by Mrs. Cartwright. Further, Mrs. Johnson learned of these checks from a worker at First Community Bank who called because she found the checks suspicious. Mrs. Cartwright said that the signature on those checks looked neater than her writing had ever been.

The Defendant contends that these checks, totaling almost $45,000, over a three month period of time were written to her for work that she had done both for Mrs. Cartwright and to the house that the Cartwrights owned and in which she lived rent free. She, however, did not act surprised when told by the sergeant investigating this case that she was accused of writing checks totaling almost $45,000. The jury squarely rejected the Defendant's testimony, convicting her of sixty-eight counts of check forgery. We conclude that sufficient evidence exists to support these convictions.

## B. Sentencing

The Defendant contends that the trial court erred when it ordered consecutive sentences and when it denied her request for an alternative sentence. When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003)[2]. This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn.

---

[2]We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the Defendant's appeal.

Crim. App. 2001).  The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401 (2006), Sentencing Comm'n Cmts.

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence, even if we would have preferred a different result.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).  In the case under submission, the record demonstrates that the trial court carefully and thoroughly considered relevant sentencing principles.  Accordingly we apply the presumption that the trial court's sentencing determinations are correct.  See Tenn. Code Ann. § 40-35-401(d).

## 1. Consecutive Sentencing

The Defendant "does not contest the fact that the Court in its discretion may find consecutive sentencing appropriate in the instant case," but she contends that, because she was given a consecutive sentence, the trial court should have given her the minimum sentence within her range.  She contends that this is the least severe measure necessary to protect the public and that her potential for rehabilitation is great.

The Defendant is correct that the trial court did not abuse its discretionary powers when it ordered that the Defendant's sentences run consecutively pursuant to Tennessee Code Annotated section 40-35-115(b).  That code section states that a trial court "may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . (2) The defendant is an offender whose record of criminal activity is extensive . . . ."  Tenn. Code Ann. § 40-35-115(b)(2) (2006).  The trial court stated that it based this "finding of an extensive criminal record by relying in part at least on earlier activity, which includes the very same convictions for which the sentence is being imposed at this point, at least if the period of activity is long enough."

The record supports the trial court's imposition of consecutive sentencing based on the Defendant's extensive criminal record.  Current offenses may be used in determining criminal history for the purposes of consecutive sentencing.  See State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992).  In Cummings, this Court upheld consecutive sentencing for a defendant with no prior criminal record who was convicted of eight crimes in a single trial based on the fact that the defendant's record of criminal activity was extensive.  868 S.W.2d at 667.  Since then, other unpublished decisions by this Court have affirmed similar decisions by trial courts.  See e.g., State v. Brian Lee Cable, No. E2005-00608-CCA-R3-CD, 2006 WL 1381484, at *8 (Tenn. Crim. App., at Knoxville, May 19, 2006), *perm. app. denied* (Tenn. Sept. 25, 2006); State v. Monsanto Undrez Cannon, No. M2005-01258-CCA-R3-CD, 2006 WL 16324, at *5 (Tenn. Crim. App., at Nashville, Jan. 4, 2006), *no Tenn. R. App. P. 11 application filed*.  Accordingly, the trial court properly exercised its discretion when it ordered the Defendant to serve her sentences consecutively.

The Defendant contends further that the amount of time that she was ordered to serve is not the least severe measure necessary to protect the public and does not reflect her potential for rehabilitation. The trial court specifically reviewed this issue, and it found:

> I am required by case law to look and determine whether or not the overall sentence is consistent with the sentencing reform act and the concerns expressed there. I think that the sentence is reasonable in light of the extent of what she did and her past record. I don't think that this is an oppressive sentence, given the fact that she took around 45 thousand dollars from someone whose mental condition and age rendered her rather helpless as a victim of this particular crime.
>
> And . . . I'm mindful that she has to be given a sentence like any other defendant, a sentence that's just bad enough to address the problem. And I think that's what's been done in this particular case. So that will be my sentence.

We conclude that the evidence does not preponderate against this finding by the trial court. The Defendant is not entitled to relief on this issue.

## 2. Alternative Sentencing

The Defendant next contends that the trial court erred when it denied her alternative sentencing. She bases her contention on Tennessee Code Annotated section 40-35-102(5) & (6), which state that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration" and "A defendant who does not fall within the parameters of subdivision (5) and is . . . [a] standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary."

In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169. Sentences involving confinement should be based upon the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

14

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103 (2006). Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence was imposed. See Tenn. Code Ann. § 40-35-103(2), (4). Further, the potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5).

Further, in addition to consideration of the aforementioned factors, it is well established that "untruthfulness is a factor which may be considered in determining the appropriateness of probation." State v. Robert Duff and Vernita Cox, No. 02C01-9307-CR-00152, 1995 WL 390951, at *3 (Tenn. Crim. App., at Jackson, June 28, 1995), *perm. app. denied* (Tenn. Nov. 6, 1995) (citing State v. Neeley, 678 S.W.2d 48, 49 (Tenn. 1984); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983)); *see also* State v. Raymond K. McCrary, No. E2003-02368-CCA-R3-CD, 2004 WL 2085364, at *4 (Tenn. Crim. App., at Knoxville, Sept. 17, 2004), *no perm. app. filed.* In addition, "[a]lthough untruthfulness is not mentioned as a factor in Tenn. Code Ann. § 40-35-103(1), this [C]ourt has continued to declare it a relevant factor in determining the suitability of probation subsequent to the enactment of the 1989 Act." Id. (citing State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992)).

We conclude that the trial court, whose findings were clear and well-articulated in the record, was well within its discretionary powers when it denied the Defendant an alternative sentence. The trial court found that the Defendant lacked potential for rehabilitation because she acted as though she did not commit these crimes, and she attempted to blame her actions on Johnson and Cartwright. Further, the trial court found, and the record evinces, that the Defendant perjured herself about her prior conviction. Finally, the trial court found that the Defendant was not remorseful, making her a risk to recidivate. The record supports the trial court's findings in this regard. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

### III. Conclusion

We agree with the judgment of the trial court. Accordingly, we affirm the Defendant's convictions and sentence.

_____
ROBERT W. WEDEMEYER, JUDGE

15